IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL LIBRADO FRANCO,<br><br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br>Case No.  2:07-cr-911 CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Defendant Daniel Librado Franco ("Franco") moves the court to suppress all evidence seized during a search of Franco's vehicle. Officer Keltsey Ware ("Officer Ware") stopped Franco for a traffic violation. During the stop, Officer Matt Jewkes ("Officer Jewkes"), from the K-9 unit, deployed his dog to do a canine sniff of Franco's vehicle. The dog alerted, and during a subsequent search, Officer Jewkes found a firearm and scales. Franco was arrested, and during a search of Franco, cocaine was found in his front pocket. Franco moves to suppress this evidence on the grounds that the scope of the stop was unreasonably extended and the dog, Tyger, lacked proper training and reliability. The court concludes that the search was appropriate, and therefore denies the motion to suppress.

## BACKGROUND

On October 3, 2007, at 1:39 a.m., Officer Ware observed that Franco's vehicle did not have a working light to illuminate his rear license plate.[1] Because this is a equipment violation, he

---

[1] Hearing Tr., 11:3–5 (Docket No. 52); Law Incident Table, 100143 (Gov't Ex. 6).

activated his overhead emergency lights to initiate a stop.[2]  Rather than immediately responding to the emergency lights, Franco continued driving.[3]  He made two turns down different streets and ducked down four times, as though he might be hiding drugs or retrieving a weapon.[4]  At times, Officer Ware could not see Franco when he ducked down.[5]  Because Franco failed to stop, Officer Ware notified dispatch that he might need assistance.[6]  Approximately forty seconds after Officer Ware activated his emergency lights, Franco finally pulled over.[7]  Officer Ware waited for back-up to arrive before approaching Franco's vehicle because of Franco's suspicious behavior.[8]  While Officer Ware was waiting for back-up, Franco threw his hands in the air in a gesture of frustration.[9]  He also turned in his seat to look back at Officer Ware, in an apparent attempt to determine Officer Ware's whereabouts.[10]

Officer Shane Cowdell ("Officer Cowdell") arrived within one minute.[11]  Both officers then approached Franco's vehicle, with Officer Cowdell on the driver's side and Officer Ware on the

---

[2] Hearing Tr., 11:6–7; 11:20–21 (Docket No. 52).

[3] *Id.* at 12:4–6.

[4] *Id.* at 12:20–13:2; 13:25–14:20.

[5] *Id.* at 14:5–8.

[6] *Id.* at 15:14–24.

[7] *Id.* at 14:22–15:2.

[8] *Id.* at 15:25–16–10.

[9] *Id.* at 17:4–11.

[10] *Id.* at 17:5–6.

[11] *Id.* at 16:13–14 (Docket No. 52); Law Incident Table, 100144 (Gov't Ex. 6).

passenger side.[12] When the officers approached his vehicle, Franco made a cell phone call and refused to look at Officer Ware.[13] Officer Ware instructed Franco to roll down his window and end the call.[14] Officer Ware obtained Franco's license and vehicle registration.[15] He then checked the status of the license and for any warrants.[16] Officer Ware learned that Franco was driving on a suspended license.[17]

Officer Jewkes heard Franco's name when Officer Ware called it in to dispatch.[18] Due to his prior experience on the metro gang unit, he knew that Franco was a gang member and that he had been involved in narcotics in the past.[19] He responded to the scene to assist Officer Ware, and to conduct a canine sniff.[20] He arrived within twelve minutes of the initial stop, at which point Officer Ware was still completing the traffic citation.[21] Officer Jewkes conducted a canine sniff with Tyger, which took between two to three minutes.[22] During that time, Tyger alerted on the driver's side door

---

[12] Hearing Tr., 16:17–21 (Docket No. 52).

[13] *Id.* at 17:16–18.

[14] *Id.* at 17:18–21.

[15] *Id.* at 19:4–8.

[16] *Id.* at 19:9–11; 19:22–25.

[17] *Id.* at 20:5–6.

[18] *Id.* at 87:1–3.

[19] *Id.* at 87:16–22.

[20] *Id.* at 87:10–12; 87:19–21.

[21] *Id.* at 21:7–18 (Docket No. 52); Law Incident Table, 100143 (Gov't Ex. 6).

[22] Hearing Tr., 97:9–15 (Docket No. 52).

and mirror.[23] Officer Jewkes then opened the vehicle door and Tyger immediately alerted on a gym bag in the back seat.[24] Next, he alerted on the turn signal and the stereo.[25] When Officer Jewkes searched the gym bag, he found a small scale that is often used to measure drugs.[26] Franco was placed under arrest at 1:57 a.m.—eighteen minutes after the initial stop.[27]

Officer Jewkes then continued to search the car and found a loaded hand gun behind the stereo.[28] Officer Ware searched Franco following his arrest and located a bindle of cocaine in the right front pocket.[29] Franco was charged with unlawful possession of a firearm, possession of cocaine and drug paraphernalia, and the traffic violations. Franco does not contest the traffic violations. He challenges the other charges, however, on the basis that the search was unlawful for two reasons.

First, Franco contends that the scope of the search was extended improperly. Officer Ware testified that during a typical traffic stop, he usually concludes it within fifteen minutes.[30] Franco's stop took eighteen minutes. Franco argues that Officer Ware extended the length of his questioning before issuing the citation merely as a ruse to allow time for the canine sniff.

---

[23] Hearing Tr., 89:23–25 (Docket No. 52).

[24] *Id.* at 91:18–24.

[25] *Id.* at 91:25–92:6; 141:25–142:6.

[26] *Id.* at 94:5–20.

[27] Law Incident Table, 100143 (Gov't Ex. 6).

[28] Hearing Tr., 95:18–96:2 (Docket No. 52).

[29] *Id.* at 23:9–11.

[30] *Id.* at 28:8–12.

Second, Franco contends that Tyger was unreliable due to insufficient training. Officer Jewkes was certified as a narcotics detector dog handler on April 24, 2002,[31] and was Tyger's original and only handler until Tyger was retired.[32] Tyger was certified as a narcotics detector dog on the same day.[33] Tyger was re-certified every year thereafter, including in March 2007, approximately six months prior to the stop at issue in this case.[34] Additionally, Tyger received maintenance training almost every week or month thereafter,[35] and was known as a "very, very reliable" dog.[36]

Franco nevertheless contends that Tyger was unreliable because the South Salt Lake police department failed to keep adequate records about Tyger's deployment in the field and his maintenance training. According to Franco, without adequate record keeping, one cannot know whether Tyger was alerting based on subconscious cuing from Officer Jewkes. Consequently, he asks the court to suppress the evidence.

---

[31] Detector Dog Handler Certificate (Gov't Ex. 1).

[32] Hearing Tr., 59:11–21 (Docket No. 52).

[33] Narcotics Detector Dog Certificate (Gov't Ex. 1).

[34] *See id.*

[35] *See* South Salt Lake Police Dep't K9 Training Documentation (Gov't Ex. 1A); Training/Certification Statistics (Gov't Ex. 2); Hearing Tr., 132:23–25; 135:24–136:6 (Docket No. 52).

[36] Hearing Tr., 207:20–21 (Docket No. 52) (quoting Sergeant Wendell Nope, developer and instructor of the K-9 program for the Department of Public Safety).

## ANALYSIS

**I.    STANDARD OF REVIEW**

"Whenever a defendant challenges a warrantless search or seizure, the government carries the burden of justifying the [officers'] actions."[37]  "It must show that the [officers] had probable cause for their actions" by a preponderance of the evidence.[38]  The Tenth Circuit "has consistently held that probable cause can be based on alerts by trained dogs."[39]  Once the government produces evidence to support the reasonableness of the officers' actions, the burden then shifts to the defendant to prove the evidence should be suppressed.[40]

Here, Officer Jewkes searched Franco's vehicle after Tyger alerted to the odor of narcotics.  The government provided evidence that Tyger was certified as a Narcotics Detector Dog in April 2002, and re-certified every year after that.  The government also provided evidence that Tyger engaged in regular maintenance training, which included the proper detection of narcotics.  The preponderance of the evidence shows that Officer Jewkes had probable cause to search Franco's vehicle based on Tyger's alert because Tyger was a trained narcotics dog.  Thus, Franco bears the burden of proving that the evidence should be suppressed because Tyger was unqualified.[41]

---

[37]  *United States v. Finefrock*, 668 F.2d 1168, 1170 (10th Cir. 1982) (citing *Chimel v. California*, 395 U.S. 752, 762 (1969)).

[38]  *Id.* (citations omitted).

[39]  *United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009) (quoting *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997)).

[40]  *See Clarkson*, 551 F.3d at 1200 (citation omitted).

[41]  *Clarkson*, 551 F.3d at 1203 (citation omitted).

**II. UNLAWFUL SEIZURE**

"A routine traffic stop is indisputably a seizure within the meaning of the Fourth Amendment."[42] For the traffic stop to be constitutional, "(1) the stop must be justified at its inception, and (2) the resulting detention must be reasonably related in scope to the circumstances that justified the stop in the first place."[43] A stop is justified if an officer "reasonably suspect[s] that a crime is in the offing."[44] "Reasonable suspicion arises when an officer of reasonable caution has a particularized and objective basis for suspecting the person stopped of criminal activity . . . ."[45] Franco does not contest that Officer Ware was justified in stopping him. He does contend, though, that Officer Ware unlawfully extended the scope of the stop when Franco was asked to step out of his vehicle for additional questioning while Officer Jewkes conducted a canine sniff of his vehicle. The court disagrees.

Officer Ware observed that Franco's rear-license-plate light was not functioning. This constituted an equipment violation that justified a stop. Franco failed to yield, however, when Officer Ware activated his emergency lights. Instead, he ducked down four times, as though he was trying to hide drugs or retrieve a weapon. When he did finally stop, he threw up his hands in frustration and turned in his seat in an apparent attempt to ascertain where Officer Ware was located. Under these facts, Officer Ware was justified in waiting for back-up before approaching Franco's

---

[42] *United States v. Pena-Montes*, No. 08-2169, 2009 U.S. App. LEXIS 26567, at *8 (10th Cir. Dec. 7. 2009) (citation omitted).

[43] *Id.* (quotations and citation omitted).

[44] *Id.*

[45] *Id.* at *8–9 (quotations and citation omitted).

vehicle. Waiting for back-up added approximately one minute to the stop.

When Officer Ware approached Franco's vehicle, Franco initially refused to look at him and carried on a cell phone conversation. Upon obtaining Franco's identification, Officer Ware learned that Franco was driving on a suspended license. Officer Ware therefore cited Franco for two traffic violations. While still in the process of completing the citations, Officer Jewkes appeared on the scene. He had knowledge of Franco's gang involvement, as well as his involvement in narcotics. Thus, Officer Jewkes conducted a canine sniff of the vehicle. As standard protocol, occupants of a vehicle are removed during a sniff to avoid distracting the dog. At the time Franco was removed from the vehicle, Officer Ware was still completing the citation. The fact that Officer Ware questioned Franco further about his activities while the canine sniff was being conducted was permissible because Franco's actions turned what would have been a routine traffic stop into a suspicious and potentially dangerous encounter. In other words, the court finds that Officer Ware was justified in asking Franco questions about his behavior based on reasonable suspicion of criminal activity.

Notably, only eighteen minutes elapsed from the time of the initial traffic stop to placing Franco under arrest. Even less time was necessary to establish probable cause to search his vehicle. Indeed, Tyger alerted within two to three minutes after Officer Jewkes started the canine sniff.[46] Officer Jewkes arrived on the scene within twelve minutes of the initial stop. Thus, only about fifteen minutes had elapsed from the time of the initial stop until Officer Jewkes had probable cause to search Franco's vehicle. Officer Ware testified that a routine traffic stop typically takes fifteen

---

[46] Hearing Tr., 97:9–15 (Docket No. 52).

minutes. Given Franco's behavior, this traffic stop was not routine. Based on the totality of these circumstances, the court concludes that the time and scope of the detention were not unreasonably extended.

### III.   ADEQUACY OF TYGER'S TRAINING

#### A.   The *Kennedy* and *Wood* Cases

Franco next contends that Tyger was unqualified to establish probable cause because inadequate records were kept. As a result, Franco contends that Tyger may have been alerting based on subconscious cues of Officer Jewkes rather than on the odor of narcotics. In *United States v. Kennedy*, a defendant challenged the validity of a search warrant because probable cause was based on the alert of the drug dog Bobo, who the defendant said was unqualified. The dog's handler failed to keep a complete record of the Bobo's field work and Bobo received only sporadic maintenance training.[47] The Tenth Circuit acknowledged:

> Over time, if not properly monitored, a dog may fall out of its trained behavior and begin responding to a handler's cues rather than to actual detection of a narcotic odor. A drug dog will lose its effectiveness in the field and may revert to old, bad habits if not continually trained. Accurate record keeping is essential to insure the dog's reliability until the dog is recertified.[48]

Nevertheless, it upheld the validity of the search warrant. Although "a dog alert might not give probable cause if the particular dog had a poor accuracy record,"[49] the court found that Bobo's accuracy rate was good. Based on the records that were kept, Bobo accurately alerted 71.4 percent

---

[47] *United States v. Kennedy*, 131 F.3d 1371, 1375 (10th Cir. 1997).

[48] *Id*.

[49] *Id.* at 1377 (quotations, citation, and alteration omitted).

of the time.[50] Additionally, Bobo had a 96 percent success rate when he was recertified "one month after his alert" at issue in the *Kennedy* case.[51] Thus, while Bobo's handler failed to keep complete records and Bobo only received sporadic maintenance training, his degree of accuracy proved that he was reliable.

In *United States v. Wood*, the court stated:

> with a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill. When the annual certification process involves actual field testing and grading of the canine's drug-detection skills . . . the canine's reliability is sufficient for a probable cause determination absent some circumstance that justifies a more complete examination of the canine's skill and performance.[52]

Factors that may justify a more complete examination include "that the dog's training or certification was substandard, that the health of the dog was such as to possibly affect reliability, and that the circumstances of the particular search raise issues regarding the dog's reliability."[53] As discussed further below, none of those factors are present here.

    **B.**    **Information in K-9 Training Records**

        1.    <u>Opinion of Franco's Expert</u>

Tyger's annual certification process involved actual field testing and grading.[54] Additionally,

---

[50] *Id*. at 1375.

[51] *Id.*

[52] *Id.* at 1378 (ellipses in original) (quoting *United States v. Wood*, 915 F. Supp. 1126, 1136 n.2 (D. Kan. 1996), *rev'd on other grounds*, 106 F.3d 942 (10th Cir. 1997)).

[53] *Wood*, 915 F. Supp. at 1136.

[54] *See* Hearing Tr., 175:1–19 (Docket No. 52).

he received regular maintenance training. Franco's expert, Steven D. Nicely ("Nicely"), opined that Tyger's training program was inadequate because the training records contain insufficient information.[55] Although he acknowledged there is no national standard for training,[56] he has "a following in the professional field, the true professionals" about what record keeping should be.[57] According to Nicely, for record keeping to be adequate, it must follow "the goals of science."[58] Specifically, "you collect the data . . . sufficiently enough to where anyone not present could take that information and reproduce the study, the training that you did."[59] This level of data, Nicely testified "[i]s the only way that you can support your dog as being reliable."[60] Because Tyger's certification and maintenance records lacked information about the exact location in the search area where a diversion or drugs were placed, they failed to meet this criteria.[61] Thus, even though Nicely admitted that everything that Tyger did during the search was "consistent with being a reliable drug detection dog,"[62] he nevertheless opined that the inadequacy of the training records made it impossible to know whether Tyger actually was reliable.[63]

---

[55] Hearing Tr., 155:1–9 (Docket No. 55).

[56] *Id.* at 152:21–24.

[57] *Id.* at 153:6–7.

[58] *Id.* at 153:7–8.

[59] *Id.* at 153:15–18.

[60] *Id.* at 154:11–12.

[61] *Id.* at 105:24–107:9.

[62] *Id.* at 174:9–13.

[63] *See id.* at 119:10–25; 127:16–23; 206:19–24.

When Tyger was initially trained, the training record contained information about the location of the search, the distractions that were used, the type of drugs used in that search, how long the drugs had been in that location, the quantity, the level of difficulty, and how well the dog did searching and indicating.[64] During re-certification, the judges used essentially the same information, although the judge's form is different from the initial training form.[65] South Salt Lake Police Department's maintenance training form differs significantly from the certification forms. Although Officer Jewkes recorded the weekly or monthly training sessions, the department's maintenance form only calls for information about the type of search area (i.e. a building, vehicle, etc.), the drug used in the training, whether diversions were used, and the length of time spent on training.[66] Because one could not take the maintenance records (or the other training records) "and reasonably, with significant accuracy, reproduce every training trial," Nicely opined the records were inadequate.[67] Moreover, the training and maintenance records did not record false positives, what behaviors precluded the dog from receiving a higher score, and the schedule of reinforcements.[68] Without this information, Nicely contends there was nothing in the records to help the handler and dog team improve.[69]

---

[64] Narco Dog Training Manual, 175 (Gov't Ex. 12).

[65] Hearing Tr., 43:1–21 (Docket No. 55); Narco Dog Training Manual, 87–88 (Gov't Ex. 12).

[66] South Salt Lake Police Dep't K9 Training Documentation (Gov't Ex. 1A).

[67] Hearing Tr., 130:9–20 (Docket No. 55).

[68] *See id.* at 120:19–25; 130:25–132:5.

[69] *Id.* at 132:6–22.

2.   Testimony of Government's Expert

The government's expert, Sergeant Wendell Nope ("Sergeant Nope"), developed the K-9 training program for the Department of Public Safety and is an instructor in the training program.[70] He also developed the training form in Narco Dog Training Manual for use as a template or sample.[71] Although he developed the form, agencies are not required to use it.[72] Rather, the only imperative is a written "track record of a dog being trained and maintained as a viable instrument of law enforcement."[73] This statement finds support in the *Wood* case quoted above. Sergeant Nope did testify, however, that "record keeping is an important part of ongoing assessment and training of dogs."[74] According to him, though, a balance must be achieved between the time spent on training and the time spent on recording details of the training because at some point there is a "diminishing value" in record keeping.[75] Sergeant Nope further testified that a handler becomes akin to a coach in sports—he comes to know his dog's performance so well that not every behavior has to be recorded in order for a handler to know that there is something which needs to be addressed.[76]

With respect to knowing whether a dog is falsely alerting, one can only tell this in a controlled environment. In the real world, it is impossible to know whether a vehicle had residual

---

[70] Hearing Tr., 163:7–16 (Docket No. 52).

[71] *Id.* at 181:18–182:2.

[72] *See* Hearing Tr., 58:17–59:6 (Docket No. 55).

[73] *Id.* at 63:19–22.

[74] *Id.* at 62:1–3.

[75] *See id.* at 55:3–14.

[76] *Id.* at 64:1–18.

odor even if no drugs were found. Consequently, during both certification and maintenance, Tyger was run through scenarios where no drugs were in the search area to determine if he was falsely alerting.[77] According to Officer Jewkes, this was not an issue with him.[78] Additionally, Sergeant Nope and Officer Jewkes testified at length about other training scenarios used to train Tyger and to maintain his skills, even though the details of all the scenarios were not recorded.

Having heard this evidence, the court agrees that the level of record keeping proposed by Nicely is not necessary to prove a dog's reliability. One does not have to record details sufficient to reproduce the exact training session to know that a dog has been adequately trained. Notably, Franco produced no evidence to show that the *actual* certification and maintenance training that Tyger received was substandard. Nor did Franco produce any evidence about the other factors listed in *Wood*. Specifically, he produced no evidence to show that Tyger had a medical condition that affected his reliability in this case. Franco also produced no evidence to show that the particular facts of this case may have affected Tyger's reliability. The court therefore concludes that none of the *Wood* factors are not present in this case to disprove Tyger's reliability.

### C. Information in the Incident Reports

#### 1. Alert to Establish Probable Cause

Despite failing to establish any of these factors, Franco nevertheless contends that certain incident reports establish that Tyger was unreliable. The government produced twenty-six incident reports in which Tyger was deployed for a canine sniff of a vehicle. Franco contends they show

---

[77] *See* Hearing Tr., 69:11–14; 124:11–21; 195:16–18; 226:18–23 (Docket No. 52); Hearing Tr., 75:3–6 (Docket No. 55).

[78] *See* Hearing Tr., 133:5–15 (Docket No. 52).

Tyger was unreliable because he alerted 100 percent of the time when he was used to establish probable cause. Of the twenty-six incidents, Tyger was used to establish probable cause to search a vehicle approximately twelve times. Ten of the times, either drugs or drug paraphernalia were located in the vehicle or on an occupant of the vehicle. In the other two situations, the occupant admitted he was a drug user in one situation, and in the other situation, a notebook was found containing "pay/owe" entries that appeared to be related to drug transactions. Thus, while Tyger did alert 100 percent of the time when used to establish probable cause, his alert was substantiated conclusively in ten of the twelve situations, and in the other two situations, Tyger may well have alerted to the residual odor of drugs in the vehicle. Even if there was not a residual odor, however, Tyger's success rate is well-within the parameters of *Kennedy* to establish reliability.

        2.       <u>Alerts on the Center Console</u>

Franco also contends that Tyger alerted on the center console a disproportionate number of times, which shows he was falsely alerting on it. Again, the incident reports do not support this contention. Tyger alerted specifically on the center console approximately fifteen times. This is less than fifty-eight percent of the time. Given the number of times drugs or drug-related items were found in or around the center console, the court does not view this percentage as problematic.

    **D.**    **Totality of the Circumstances**

According to the testimony at the suppression hearing, Tyger consistently performed and his performance was high compared to some other narcotic detection dogs. His abilities made him "very, very reliable" and were well-known in the K-9 community. The incident reports substantiate Tyger's reliability. Additionally, Tyger was re-certified yearly and received regular maintenance training according to the records that were produced. Based on the totality of the evidence, the court

concludes that Tyger was reliable and that his alert established probable cause to search Franco's vehicle.

The court does note, however, that while the maintenance records and incident reports of South Salt Lake's police department were adequate in this case based on the totality of the circumstances, such may not always be the case due to the brevity of what was recorded in the maintenance records and the limited number of incident reports that were provided. Nevertheless, the brevity of the records is insufficient to warrant suppression of the evidence under the circumstances of this case.

## **CONCLUSION**

The court concludes that Officer Ware did not improperly extend the scope of the stop. The court further concludes that Tyger was reliable and that his alert established probable cause to search Franco's vehicle. The court, therefore, DENIES Franco's Motion to Suppress.[79]

DATED this 11th day of December, 2009.

BY THE COURT:

_____
Clark Waddoups
United States District Judge

---

[79] Docket No. 23.